**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mauna Loa Vacation Ownership, L.P., a Hawaiian limited partnership, and Stevens, a single man, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. CV 03-0846-PCT-DGC  **ORDER** |
| Plaintiff, | | |
| vs. | | |
| Accelerated Assets, L.L.C., an Arizona limited liability company, | | |
| Defendant. | | |

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. #62), Defendant's Motion for Partial Summary Judgment Re: Characterization of Transactions as Sales (Doc. #67), Defendant's Motion for Partial Summary Judgment Re: Amount Owed on Counterclaim (Doc. #68), Plaintiffs' Cross Motion Regarding Stevens' Personal Guaranty, and Certain Unenforceable Penalties (Doc. #72), and Defendant's Motion to Strike the Second Declaration of John Stevens (Doc. #94).[1]

---

[1] The Court will deny the request for oral argument because the parties have submitted memoranda thoroughly discussing the law and evidence and the Court concludes that oral argument will not aid its decisional process. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991), *cert denied*, 503 U.S. 920 (1992).

**Background**

The dispute in this case arises from a series of contracts under which Plaintiffs, sellers of resort timeshares, sold Defendant promissory notes generated by sale of the timeshares and secured by the timeshares. The contracts obligated Plaintiffs to buy back or replace any non-performing notes. As part of the contracts, Plaintiff John Stevens personally guaranteed the buy-back and replacement obligations.

On January 9, 2004, Plaintiffs filed an amended complaint seeking a discharge from the guaranty, excuse of performance, rescission and restitution, and release from penalties. Plaintiffs seek this relief on the basis of Defendant's alleged breach of the contracts. Doc. #33. Defendant counterclaimed on January 26, 2004, alleging that Plaintiffs breached the contracts by failing to repurchase or replace non-performing notes and failing to pay the late fees specified in the contracts. Doc. #34.

Defendant has moved for summary judgment on all of Plaintiffs' claims and affirmatively on its own claims. Doc. #62. Plaintiffs oppose summary judgment and have filed their own motion on the issue of Stevens' personal guaranty and the enforceability of the contracts' late fee provisions. Doc. #72.

**Discussion**

**I.   Defendant's Motion for Summary Judgment.**

Defendant argues that Plaintiffs cannot sustain their breach of contract and breach of good faith and fair dealing claims because the contracts do not include the servicing obligations Plaintiffs allege. Defendant also argues that Stevens waived any surety defenses by giving an unconditional guaranty and that Plaintiffs are barred as a matter of law from arguing that Defendant's actions impaired the value of Plaintiffs' interest in the promissory notes. Defendant ask the Court to enter judgment against Plaintiffs for failing to comply with their replacement and repurchase obligations under the contracts.

//

//

**A.     Breach of Contract/Breach of Good Faith and Fair Dealing.**

Plaintiffs allege that Defendant breached the contracts and the covenant of good faith and fair dealing by servicing the promissory notes in a fashion that increased Plaintiffs' risk in the notes and deprived Plaintiffs of the benefits they expected under the contracts. Plaintiffs additionally claim that Defendant's faulty notices regarding delinquent notes breached the contracts. Defendant argues that Plaintiffs cannot sustain their breach of contract or good faith and fair dealing claim because the contracts contain no servicing obligations. The Court will deny Defendant's motion for summary judgment on these claims. Plaintiffs have raised issues of fact that must be resolved at trial.

When construing a contract under Arizona law, the Court is not limited to the four corners of the document. "[A] court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct . . . ." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993). If the Court concludes from this review of extrinsic evidence that the contract language is "reasonably susceptible to more than one interpretation," extrinsic evidence concerning the meaning of the agreement and the parties' intent is admissible and may be considered by a jury. *Id.* at 1144-45.

Considering such evidence in this case, the Court concludes that the contracts in question are susceptible to the interpretations suggested by both Defendant and Plaintiffs. To be sure, the contracts say nothing about the servicing agreement claimed by Plaintiffs. One would think that sophisticated business people, particularly those familiar with the timeshare business and the importance of note performance, would have included such terms in the contracts if they had been agreed to by the parties.

On the other hand, four of the five contracts state that Defendant "shall handle delinquent accounts." *See* DSOF, Exs. 1-4 to Stevens Depo. (Ex. A).[2] The term "handle" is not defined in the contracts and its meaning is not readily apparent from their face.

---

[2] The fifth contract (Ex. 5) does not contain this language, but Plaintiffs have presented evidence that the same servicing agreement applied. *See* PSOF ¶¶ 30, 36-40.

Plaintiffs have presented evidence that the parties agreed Defendant would service the accounts and achieve a delinquency rate comparable to Plaintiffs' experience (3%) and industry standards (approximately 3.7%). *See* PSOF ¶ 30. Defendant disputes this evidence and asserts that servicing was never discussed or agreed upon by the parties. *See* DSOF ¶¶ 18-20.

Although the Court finds Defendant's construction of the contacts more plausible, Plaintiffs have presented the sworn statement of Mr. Stevens that Defendant's servicing obligation was discussed and agreed to by the parties. Because the Court finds that the contracts are susceptible to Plaintiffs' construction, and Plaintiffs have created a question of fact as to whether their version of events is true, a trial is necessary. The Court cannot resolve these disputed issues of material fact by summary judgment.

Defendant makes several additional arguments that will be addressed in turn.

**1. Motion to Strike Stevens' First Affidavit.**

Defendant moves to strike the Stevens' affidavit that provides the basis for Plaintiffs' interpretation of the contracts. Defendant claims that the affidavit is a "sham" because it contradicts Stevens' prior testimony regarding the same issues.

"If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). "This rule, however, is limited to 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Id*.

The Court has reviewed the portions of the Stevens deposition cited by Defendants and cannot conclude that the affidavit is a sham.[3] Although it is true that Stevens

---

[3] The Court has not read the entire Stevens deposition. The Court is required to review only those portions of the evidence cited by the parties. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

- 4 -

1 answered various questions about his discussions with Defendant, and that his answers
2 do not include his affidavit-made assertion of a specific servicing agreement, it is also true
3 that he was not directly asked if the parties reached such an agreement.  Stevens did testify
4 that he understood Plaintiffs would not "be obligated . . . to repurchase delinquent
5 accounts that were made delinquent for reasons other than actions of ourselves," Def.
6 Obj., Ex. 1 at 92:12-14, an assertion consistent with the general tenor of his affidavit.
7 Stevens also noted the ambiguity of the word "handle" during his deposition, but defense
8 counsel did not pursue Stevens' understanding of the term.  *Id*. at 90:2-91:2.

9       Moreover, the Court cannot conclude that Stevens' later detailed recollection
10 regarding the Static Pool Report was a sham.  At the deposition, Stevens recognized the
11 document as one analyzing default rates, *see* Def. Obj., Ex. 1 at 133:20-134:15, and the Court
12 cannot conclude that Stevens' later review of the document did not refresh his recollection
13 of the document's context and meaning.

14       Finally, Plaintiffs argue that Stevens' testimony that he could not recall "industry
15 minimum standards" for collections belies his affidavit claim that Defendant agreed to
16 service the notes commensurate with a certain rate.  Stevens' affidavit, however, does not
17 discuss "minimum industry standard[s]," as was discussed in the deposition.  *Id*. at 79:10-
18 17.  The affidavit describes Stevens' historical default rate and industry averages.  *See*
19 PSOF, Ex. 1 ¶ 7.

20       The "sham affidavit" rule "does not automatically dispose of every case in which
21 a contradictory affidavit is introduced to explain portions of earlier deposition testimony."
22 *Kennedy*, 952 F.2d at 266-67.  Rather, the trial court must find that the affidavit "flatly
23 contradicts" earlier testimony and is in fact a sham.  *Id*. ay 266.  The Court cannot make that
24 finding in this case.  The deposition and affidavit subjects, although clearly related, are
25 sufficiently different in wording and scope to leave a realistic possibility that the affidavit
26 simply constitutes a refreshed and more complete statement of Stevens' recollection.

27
28

The Court accordingly will not strike the affidavit. Defendant will, of course, have the opportunity to confront Stevens with any inconsistencies at trial. The jury will assess the credibility of Stevens and other witnesses in this case.

### 2. Article 9 of the UCC.

Defendant argues that Article 9 of the UCC bars Plaintiffs' good faith claim because § 9-607's requirement that a transferee of a promissory note act reasonably vis-à-vis a guarantor of the note applies only when the transferor is completely excluded from servicing or collecting on the note, citing *Federal Deposit Ins. Corp. v. Ft. Worth Aviation*, 806 F.2d 575, 577 (5th Cir. 1986). Defendant contends that Plaintiffs were not completely excluded from collecting on the notes and that Article 9's "commercially reasonable" standard therefore does not apply.

The Court has reviewed UCC § 9-607 and *Ft. Worth Aviation* and disagrees with Defendant's characterization of the reasonableness requirement. To the extent that § 9-607 applies to this case, the Court finds that it does not bar Plaintiffs' claim that Defendant's servicing efforts breached the covenant of good faith and fair dealing.[4] UCC commentary explains that the commercially reasonable requirement does apply in cases like this where the "assignment to the secured party was a 'true' sale" and "the secured party does have a right of recourse." UCC § 9-607 Cmt. 9. The reasonableness requirement applies for the reasons underlying Plaintiffs' claim in this case – "the obligation to proceed in a commercially reasonable manner arises because the collection process affects the extent of the seller's recourse liability . . . ." *Id*. The substance of Plaintiffs' claim is that Defendant's unreasonable servicing efforts increased Plaintiffs' recourse obligations under the contracts. *Ft. Worth Aviation* does not stand for the proposition stated by Defendant. The case holds that the UCC does not impose an obligation to collect receivables, only that "a secured party who undertakes to collect from account debtors must do so in a commercially reasonable manner." 806 F.2d at 577.

---

[4] Plaintiffs have not asserted Article 9 as a basis for their claims in this case.

- 6 -

1 Defendant also argues that Article 9 bars recovery because even if Defendant
2 breached an obligation by unreasonably servicing the notes, any resulting damage to
3 Plaintiffs would simply reduce Plaintiffs' repayment and repurchase obligations under the
4 contracts and Plaintiffs would remain liable for the balance. *See International Harvester*
5 *Co. v. Fuoss*, 758 P.2d 649, 651 (Ariz. Ct. App. 1988); *FDIC v. Wrapwell Corp.*, 922 F. Supp.
6 3d 913, 925 (S.D.N.Y. 1996). The Court finds Defendant's argument unpersuasive. In
7 contrast to the parties in *International Harvester* and *Wrapwell* who explicitly relied on
8 the UCC defenses (or the state-law equivalent), Plaintiffs seek a discharge based on
9 Defendant's material breach of contract, not based on the reasonableness provisions of
10 the UCC. Additionally, Defendant has not shown that the reduction in Plaintiffs' liability
11 for Defendant's damaging unreasonableness would not equal the amount owed by
12 Plaintiffs under the contracts, effectively resulting in a complete discharge.

### 3. The Covenant of Good Faith' Intent Requirement.

14 Defendant contends that Plaintiffs cannot sustain their breach of good faith claim
15 because bad faith requires a showing of intentional bad acts, a showing Plaintiffs have not
16 made in this case. Defendant cites *Wells Fargo Bank v. Ariz. Laborers, Teamsters &*
17 *Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 46 (Ariz. 2002). Plaintiffs
18 contend that Arizona good faith contract law is broader and encompasses Defendant's
19 alleged poor servicing in this case.

20 Arizona law "prohibits a party from doing anything to prevent other parties to the
21 contract from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank*,
22 38 P.3d 12 at 43 (emphasis added). "This obligation 'preserves the spirit of the bargain
23 rather than the letter and guarantees the protection of the parties' reasonable expectations
24 . . . .'" *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). *Bike Fashion*
25 further elaborates:

> [A] party can breach the implied covenant of good faith and fair dealing both
> by exercising express discretion in a way inconsistent with a party's
> reasonable expectations and by acting in ways not expressly excluded by the

>contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain.

*Id.*

Plaintiffs make clear that they are not asserting a tort claim for bad faith. Plaintiffs have presented evidence that they were deprived of the expected benefit of the contracts by Defendant's alleged faulty servicing of the promissory notes and by Defendant's failure to respond when Plaintiffs raised concerns about the servicing. *See* PSOF ¶¶ 30-47. This evidence raises questions of fact concerning the parties' expectations under the contracts and whether they were breached.

### 4. Statistical Basis for Plaintiffs' Default Claim.

Defendant attacks Plaintiffs' statistical evidence regarding the alleged increase in Plaintiffs' default rates, arguing that the evidence does not support Plaintiffs' claim. The Court finds the evidence, construed in Plaintiffs' favor, sufficient to raise a factual issue. Defendant asks the Court to adopt its interpretation of the data, something the Court cannot do at this stage when all inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Whether, as Defendant argues, there are many possible causes for an increase in default rates or whether Plaintiffs' own breach of their recourse obligation affected the default rate are questions of fact for the jury.

### B. Did Stevens Waive His Surety Defenses?

Defendant argues that Stevens waived his surety defenses in the contracts. Stevens claims that he made no such waiver and retains all surety defenses.

The Court has reviewed the contracts and finds that Stevens did not waive his surety defenses as a matter of law. Defendant points to the language in the contracts that Stevens assumed an "absolute, unconditional and continuing guaranty which shall not be affected by any act or thing . . . ." DSOF ¶ 21. Defendant claims that this language served to waive all of Stevens' surety defenses.

The language cited by Defendant creates an unconditional, as opposed to a conditional, guarantee by Stevens. As explained by Defendant's own cited case, *Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp.*, 243 F.2d 196, 200 (10th Cir. 1957), the unconditional guaranty allows Defendant to pursue recourse against Stevens, the guarantor, without first pursuing recourse against MLVO, the primary obligor. Arizona law requires explicit waiver of surety defenses beyond the guarantee itself. *See Data Sales Co. v. Diamond Z Mfg.*, 74 P.3d 268, 272 (Ariz. Ct. App. 2003) (stating that a waiver must be "effectuated by specific language or by general language indicating that the secondary obligor waives defenses based on suretyship" (quotation omitted)). Moreover, "[i]n Arizona . . . contracts of guaranty are strictly construed to limit the liability of the guarantor." *Horizon Resources Bethany v. Cutco Indus.*, 881 P.2d 1177, 1181 (Ariz. Ct. App. 1994). The guaranty language cited by Defendant makes no mention of a waiver of surety defenses. Strictly construing the language of the guaranty, the Court cannot conclude that Stevens waived his right to surety defenses as a matter of law.[5]

### C.  Availability of Plaintiffs' Impairment Claim.

Plaintiffs claim that Defendant's poor servicing caused them significant injuries and warrant Plaintiffs' release from their guaranty obligations. Defendant argues that Plaintiffs suffered no injury because Defendant's alleged actions did not impair the underlying notes or their collateral and Plaintiffs can still obtain value through collection of the notes or foreclosure of the collateral. Defendant cites Restatement (Third) of Suretyship & Guaranty § 37 in arguing that Plaintiffs cannot make any impairment claim.

The Restatement provides:

> If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance . . . the secondary obligor is

---

[5] Defendant argues that MLVO is not a surety or guarantor, but does not clearly explain the implications of this argument. Plaintiff does not directly respond to the argument. The parties should address this issue in preparing their proposed final pretrial order and inform the Court in the proposed order whether additional legal rulings are required.

- 9 -

> discharged as described in subsections (2) and (3), and the secondary obligor has a claim against the obligee as described in subsection (4). An act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."

Restatement (Third) of Suretyship & Guaranty § 37. Plaintiffs' claim mirrors the Restatement. Plaintiffs assert that Defendant's alleged actions increased Plaintiffs' risk of loss by increasing their potential cost of performance. Furthermore, subsections (2) and (3) make clear that, if Plaintiffs' claim is valid, they may be released from performing the portion of their obligations caused by Defendant's bad acts. *See id.* Plaintiffs have submitted evidence that they explicitly bargained for a 3% default rate and, because of Defendant's actions, ended up with a 20% default rate. Defendant disagrees. A jury will decide whether Defendant's actions caused the higher default rate and whether Plaintiff's obligations should be reduced accordingly.

Defendant additionally argues that Plaintiffs cannot sustain their claim because they have not shown that Defendant's alleged actions affected any particular promissory note, citing generally to Restatement (Third) of Suretyship & Guaranty § 49, *International Harvester Co.*, 758 P.2d at 649, and *FDIC*, 922 F. Supp.3d at 925. The Court has reviewed these authorities and does not conclude that Defendant must prove its damages for each particular note rather than globally for the notes as a whole.

**D.    Defendant's Motion for Summary Judgment on its Counterclaims.**

Defendant moves for summary judgment on its counterclaims, arguing that the Court should enter judgment against Plaintiffs for shirking their guaranty obligations. The Court will deny Defendant's motion. The issues of fact identified above preclude summary judgment.

**II.    Plaintiffs' Motion for Summary Judgment.**

Plaintiffs' move affirmatively on two of their claims. First, they argue that Stevens should be discharged from his guaranty as a matter of law because of Defendant's alleged

breach of the contracts and refusal of Plaintiffs' tender of performance. Second, they ask the Court to declare the contracts' late penalties unenforceable as a matter of law.

### A. Stevens' Discharge.

Plaintiffs argue that the Court should discharge Stevens from the guaranty because Defendant breached the contracts and refused Plaintiffs' tender of performance. Issues of fact preclude summary judgment in favor of Plaintiffs. As discussed above, there are issues of fact as to whether there was an agreement between Plaintiffs and Defendant regarding levels of servicing and whether Defendant breached the agreement, and issues of fact as to whether Defendant gave Plaintiffs adequate notice regarding the defaulted notes. In addition, although Plaintiffs claim that they tendered performance for their full obligation, Defendant claims that full performance was not tendered.

### B. Enforceability of the Contracts' Late Penalties.

Plaintiffs ask the Court to declare the contracts' late fee provision unenforceable as a penalty. Under Arizona law, "parties to a contract are not free to provide a penalty for its breach. . . . Punishment of a promisor for having broken his promise has no justification on either economic or other ground and a term providing such a penalty is unenforceable on the grounds of public policy." *Pima Sav. & Loan Ass'n v. Rampello*, 812 P.2d 1115, 1118 (Ariz. Ct. App. 1991). Arizona law presumes that "an agreement made in advance of a breach is a penalty [and unenforceable] unless both of two conditions are met." *Id.* First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by any breach. *See Larson-Hegstrom & Associates, Inc. v. Jeffries*, 701 P.2d 587, 591 (Ariz. Ct. App. 1985). Second, the harm must be one that is incapable or very difficult of accurate estimation. *See id.* "Whether a stipulation is for liquidated damages or a penalty is a question of law for the court." *Pima*, 812 P.2d at 1118.

Defendant has failed to overcome the presumption that the contract late fee is an unenforceable penalty. Plaintiffs, in their cross-motion, clearly set forth Defendant's two-fold burden in proving that the late fee is enforceable, citing *Larson-Hegstrom*, 701 P.2d

- 11 -

at 591. In response, Defendant provides no evidence or analysis showing that the late fee was a reasonable forecast of damages or that estimating damages would have been difficult in this case. Defendant asserts that it was required to hire an extra employee to help collect on the notes and has incurred other costs as a result of Plaintiffs' failure to perform. The fact that Defendant may have been damaged in an unspecified amount by Plaintiffs' alleged breach, however, does not show that $20 per day was a reasonable forecast of damages that were otherwise difficult to estimate. The Court will grant Plaintiffs summary judgment on this issue. Defendant has failed to respond to Plaintiffs' motion with evidence that the $20 per day late fee is not an unenforceable penalty.

### III. Defendant's Motion Regarding Damages.

The Court will deny Defendant's motion for summary judgment regarding the amount owed on Defendant's counterclaim. Because Defendant has not met its burden of showing that it is entitled to summary judgment on its claims, the Court cannot conclude that Defendant is entitled to damages. Furthermore, the Court's determination that the late fee is unenforceable undercuts a substantial portion of the damages claimed by Defendant in its motion.

### IV. Defendant's Motion Regarding Sales vs. Loans.

Plaintiffs concede that their contracts with Defendant involved the sale of promissory notes rather than loans. The Court will grant Defendant's motion for summary judgment on this issue.

### V. Defendant's Motion to Strike Stevens' Second Affidavit.

The Court did not rely on Stevens' second affidavit in making its summary judgment rulings and therefore will deny Defendant's motion as moot.

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. #62) is **denied**.
2. Defendant's Motion for Partial Summary Judgment Re: Characterization of Transactions as Sales (Doc. #67) is **granted**.

3. Defendant's Motion for Partial Summary Judgment Re: Amount Owed on Counterclaim (Doc. #68) is **denied**.

4. Plaintiffs' Cross Motion Regarding Steven's Personal Guaranty, and Certain Unenforceable Penalties (Doc. #72) is **denied in part and granted in part** as set forth above.

5. Defendant's Motion to Strike the Second Declaration of John Stevens (Doc. #94) is **denied as moot**.

6. A Final Pretrial Conference will be set by separate order.

DATED this 28th day of September, 2005.

_David G. Campbell_
David G. Campbell
United States District Judge