**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mauna Loa Vacation Ownership, L.P., a Hawaiian limited partnership, and Stevens, a single man,<br><br>    Plaintiffs,<br><br>vs.<br><br>Accelerated Assets, L.L.C., an Arizona limited liability company,<br><br>    Defendant. | No. CV-03-0846-PCT-DGC<br><br>**ORDER** |

This case was tried to the Court on February 21-23, 2006. Several witnesses testified and dozens of exhibits were placed in evidence. The parties also submitted deposition excerpts and trial memoranda. The findings of fact set forth below are based on the Court's consideration of all the evidence, including the Court's assessment of the credibility of witnesses at trial.

## BACKGROUND

This case arises from a series of contracts under which Plaintiffs Mauna Loa Vacation Ownership, L.P. ("MLVO") and John Stevens ("Stevens") sold Defendant Accelerated Assets, L.L.C. ("Accelerated") promissory notes generated by the sale of Hawaiian resort timeshares. The contracts between the parties obligated MLVO to buy back or replace non-performing notes. As part of the contracts, Stevens personally guaranteed MLVO's buy-back and replacement obligations.

Plaintiffs seek to be discharged from their recourse and guarantee obligations. Plaintiffs seek this relief on the basis of Defendant's alleged breaches of the contracts. Doc. #33. Accelerated counterclaims, alleging that Plaintiffs breached the contracts and guarantees by failing to repurchase or replace non-performing notes. Doc. #34. The Court entered an order on September 28, 2005, granting summary judgment in favor of Plaintiffs on Defendant's claim for payment of $20-per-day penalties under the contract. Doc. #95.[1]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.     Undisputed Facts.**

1.     MLVO is a limited partnership created and existing under the laws of the state of Hawaii. Stevens has interests in both the limited partner and general partner of MLVO, which are not parties to this action.

2.     Accelerated is a limited liability company created and existing under the laws of the state of Arizona.

3.     MLVO sold timeshare interests in the Mauna Loa Village by the Sea Resort near Kailua-Kona, Hawaii. Some consumers paid for their timeshares with cash, but most made a down payment and signed a promissory note to MLVO for the balance of the purchase price. The promissory notes will be referred to as the Consumer Notes. Each

---

[1] Accelerated's trial memorandum argues that the Court should reconsider this ruling because the Court incorrectly placed the burden on Accelerated of establishing the validity of the penalty provisions in the contracts. Accelerated contends that the Court incorrectly applied a presumption that a penalty provision is unenforceable, and incorrectly relieved Plaintiffs of proving the unenforceability of the penalty provisions. The Court disagrees. The Court believes that it read the *Larson-Hegstrom* case correctly. *See* Doc. #95 at 11. Moreover, Plaintiffs argued in their motion for summary judgment that Accelerated could not satisfy the two conditions required for the enforceability of a penalty provision under Arizona law – that the amount fixed in the contract must be a reasonable forecast of just compensation for the harm caused by a breach, and that the harm is incapable or very difficult of accurate estimation. *Id.* With Plaintiffs having made this argument in their motion, Accelerated was obligated to come forward with evidence showing that the two requirements of Arizona law could be satisfied. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Accelerated made no such showing in response to Plaintiffs' motion, and summary judgment in Plaintiffs' favor was therefore appropriate. *Id.*

- 2 -

1   Consumer Note is secured with a Deed of Trust encumbering the consumer's timeshare
2   interest at the resort.

3       4.    MLVO entered into five contracts with Accelerated, referred to herein as the
4   Purchase Agreements. The Purchase Agreements concerned the purchase by Accelerated of
5   Consumer Notes from MLVO.

6       5.    The first Purchase Agreement was dated April 21, 2000, and concerned
7   approximately 28 Consumer Notes purchased by Accelerated. Ex. 4.[2] The second Purchase
8   Agreement was dated June 15, 2000, and concerned the purchase of 75 Consumer Notes.
9   Ex. 6. The third Purchase Agreement, dated September 6, 2000, concerned the purchase of
10  24 Consumer Notes. Ex. 8. The fourth Purchase Agreement was dated November 30, 2000,
11  and concerned approximately 30 Consumer Notes purchased by Accelerated. Ex. 10. The
12  fifth Purchase Agreement, dated September 26, 2001, concerned the purchase by Accelerated
13  of substantially more Consumer Notes than the previous transactions – 375 Notes in all.
14  Ex. 12. An additional batch of Consumer Notes, referred to herein as the sixth transaction,
15  was transferred to Accelerated by MLVO as partial payment of a loan made by Accelerated
16  to a company related to MLVO.

17      6.    In each transaction except the sixth, the purchase price paid by Accelerated was
18  the face amount of the Consumer Notes multiplied by a discount factor. The discount factor
19  varied from transaction to transaction.

20      7.    Each of the Purchase Agreements called for MLVO to replace or repurchase
21  non-performing notes. *See, e.g.,* Ex. 4 ¶ 7. MLVO was obligated to replace or repurchase
22  a Note within 30 days of receiving written notice that the Consumer Note had become more
23  than 60 days delinquent. *Id.*

24      8.    With respect to each Purchase Agreement, Stevens executed an Individual
25  Guarantee which stated that he was personally guarantying the replacement and repurchase

---

[2] This citation refers to Exhibit 4 placed in evidence at trial. Exhibits will be referred to in this manner throughout this order.

obligations of MLVO. Exs. 5, 7, 9, 11, 13, 101. Stevens' guarantee was "an absolute, unconditional and continuing guarantee which shall not be affected by any act or thing whatsoever except as herein provided and which shall be independent of and in addition to any other guarantee, endorsement or collateral held by Accelerated[.]" *See, e.g.,* Ex. 4 ¶ 2.

9. Plaintiffs claim that MLVO's replacement and repurchase obligations and Stevens' guarantee of those obligations should be discharged because Accelerated breached the Purchase Agreements, or the covenant of good faith and fair dealing implied in those agreements, by failing to service the Consumer Notes properly and by failing to give proper written notice of the replacement and repurchase obligations as required by the Purchase Agreements. Accelerated counterclaims for the amount due under MLVO's and Stevens' recourse obligations.

**B.    Accelerated Did Not Breach The Purchase Agreements Through Poor Servicing.**

1. The Purchase Agreements say little about Accelerated's servicing obligations. The Purchase Agreements for the first four transactions contain only this sentence: "Purchaser [Accelerated] shall handle delinquent accounts." *See, e.g.,* Ex. 4, ¶ 7. The Purchase Agreement for the fifth transaction omits even this limited reference to servicing. *See*, Ex. 12 ¶ 7. There is no Purchase Agreement for the sixth transaction.

2. Even though the fifth and sixth transactions contain no contract language addressing Accelerated's servicing obligations, the parties agree that those obligations are at least as substantial as the obligations set forth in the first four transactions.

3. The Purchase Agreements do not define the word "handle." They contain no additional language describing Accelerated's obligations with respect to handling of the Consumer Notes or delinquencies in those Notes.

4. The Purchase Agreements did not provide that MLVO's and Stevens' obligations were conditioned upon the Consumer Notes achieving a particular default rate. During trial, Stevens and his counsel both stated that the recourse obligations were not conditioned on Accelerated achieving a particular default rate, a concession that is consistent with the evidence.

1    5.    The Purchase Agreements did not specify particular servicing techniques or methods to be used by Accelerated.  They merely stated that Accelerated would "handle" delinquencies.

    6.    Stevens claims that the fifth and sixth transactions included an agreement that Accelerated would use Concord Servicing Corporation ("Concord") to service the Consumer Notes in those transactions.  The Court finds that no such agreement was reached.

        a.    The Purchase Agreement for the fifth transaction specifically stated that servicing of the Consumer Notes would be transferred from Concord to Finova, the company traditionally used by Accelerated for servicing notes.  *See* Ex. 12 ¶ 4.

        b.    Stevens signed the Purchase Agreement that called for Finova to be the servicing agent.  Stevens testified at trial that he did not recall whether he read the Purchase Agreement before signing it.  He testified in his deposition that he read the agreement before signing it.  Regardless, Stevens, an experienced businessman, signed an agreement that expressly provided that Accelerated would use Finova, not Concord, for servicing the Consumer Notes in the fifth transaction.

        c.    Although Stevens testified that Accelerated agreed to use Concord in the fifth and sixth transactions, the principal of Accelerated, Tom Balames, testified that no such agreement was reached.  The Court finds Mr. Balames to be more credible on this point.  In addition to the fact that the Purchase Agreement for the fifth transaction expressly provided that Finova would be retained to service the Notes, MLVO and Stevens did not claim that Accelerated breached the agreements when it transferred the Consumer Notes from Concord to Finova.  The effective date of the transfer was December 1, 2002.  *See* Ex. 105.  Brenda LeClair testified that the transfer actually occurred on December 4, 2002.  The first complaint about the transfer contained in the record was a January 22, 2003 letter in which Stevens simply stated that the transfer was "most concerning."  *See* Ex. 40.  Stevens did not assert that the transfer breached an agreement to use Concord for servicing on the fifth and sixth transactions.

1         7.      The Court finds that Accelerated's performance of its servicing obligations did not breach the Purchase Agreements.

        a.      The parties agree that the two leading servicing companies for timeshare notes in the United States are Concord and Finova. Walter Andrade, who worked on the transactions and was for a time aligned with Plaintiffs, testified that both companies are well regarded. Other evidence from Plaintiffs confirmed that Finova and Concord are the two major players in the servicing of timeshare consumer notes.

        b.      Accelerated retained Finova to manage the servicing of all of the transactions. Plaintiffs presented evidence regarding the ultimate default rate among the notes owned by Accelerated, and presented evidence of various complaints about Finova's servicing activities, but presented no specific evidence regarding failures by Finova in servicing the notes. Indeed, Stevens testified that there are no minimum industry standards for servicing, and Tom Balames, Walter Andrade, and Don Kim all testified that Finova is a reputable and competent servicing company. Brenda LeClair did testify that contacts with consumers varied drastically between Finova and Concord, but she did not explain how the contacts varied and she could identify no specific instance where a default occurred because of Finova or Accelerated.

        c.      Plaintiffs noted that Accelerated did not have an in-house servicing department, but the Purchase Agreements did not require one. Accelerated contracted with Finova to perform the servicing.

        d.      Plaintiffs presented evidence through their expert witness, Stefan Boedeker, that the notes owned by Accelerated experienced a significantly higher default rate than notes of a similar kind sold by MLVO to another buyer. In light of this discrepancy, Plaintiffs' expert opined that the difference in delinquency rates must have been attributable to servicing practices. But the expert, who is a statistician and not an expert in servicing of Consumer Notes, did not identify any specific shortcomings in Finova's or Accelerated's servicing practices.

- 6 -

8. In summary, the Purchase Agreements merely required Accelerated to "handle" delinquencies in the Consumer Notes. The agreements did not specify particular servicing practices Accelerated was obligated to follow, nor did they specify a minimum default rate to be achieved through Accelerated's servicing. In discharge of its servicing obligations, Accelerated retained one of two leading servicing companies in the timeshare note industry. Plaintiffs presented no evidence of specific deficiencies in Finova's servicing of the notes. In light of these facts, the Court does not find that Accelerated breached its servicing obligations under the Purchase Agreements.

**C. Accelerated Did Not Breach the Covenant of Good Faith and Fair Dealing Through Improper Servicing.**

1. As noted above, Accelerated retained an industry leader to service the Consumer Notes. Plaintiffs do not claim that the agreement between Accelerated and Finova was deficient. The evidence presented at trial made clear that Accelerated relied on Finova to handle servicing and collection of the Consumer Notes.

2. When concerns developed about collection on the Consumer Notes, Accelerated retained another company, EMCC, Inc., to collect on the notes. Ex. 20. The company was specifically retained to undertake more diligent collection efforts than those required of Finova under the servicing agreement.

3. Throughout its servicing of the Consumer Notes, Accelerated kept MLVO apprized of the Notes' performance. Accelerated did so by sending MLVO weekly aging reports that showed the performance of each of the notes acquired by MLVO.

4. The Court does not find that Accelerated acted in bad faith, sought to exercise its discretion in a way inconsistent with the parties' expectations in the Purchase Agreements, or otherwise sought to prevent MLVO or Stevens from receiving the benefits of their contracts.

5. The Court finds that Accelerated's servicing of the Consumer Notes did not violate the covenant of good faith and fair dealing implied in the Purchase Agreements.

**D.     Accelerated Did Not Breach The Purchase Agreements By Providing Improper Notices of Delinquency.**

1.     The parties vigorously dispute whether Accelerated provided MLVO with adequate notice of the delinquencies in the Consumer Notes and of MLVO's replacement and repurchase obligations under the Purchase Agreements.

2.     As with Accelerated's servicing obligations, the Purchase Agreements say little about Accelerated's notice obligations. The agreements contain the following sentence: "[MLVO] agrees that with respect to any [Consumer Note] which at any time during the life of the [Consumer Note] has one or more payments more than sixty (60) [days] past the due date [MLVO] shall, *if so notified in writing*, repurchase the [Consumer Note] from [Accelerated] at a price equal to the outstanding principle balance of the [Consumer Note] discounted by the Discount Factor and any commissions plus accrued but unpaid interest within thirty (30) days of *written notification* to [MLVO]." Ex. 4 ¶ 7 (emphasis added).

3.     The Purchase Agreements do not specify the form of the written notice to be given to MLVO. Stevens testified at trial that no form of notice was discussed between the parties.

4.     The history of the parties' dispute sheds light on the notice requirement and will therefore be recounted in some detail.

    a.     The first five Purchase Agreements were entered into between April 21, 2000 and September 26, 2001. Exs. 4, 6, 8, 10, 12.

    b.     The sixth transfer of Consumer Notes occurred sometime between September 26, 2001 and March 7, 2002. Exs. 101, 132.

    c.     During the time between the first transaction and June of 2002, MLVO either replaced or repurchased delinquent Consumer Notes on four separate occasions. Ex. 39.[3]

---

[3] Other evidence suggests that there were two replacement transactions, but the number does not matter. The significant fact is that the parties agreed on and consummated replacement transactions on the basis of electronic notices, as described below.

- 8 -

   d. An additional replacement of delinquent notes was scheduled to occur in June of 2002. The notes were identified, an escrow was established, but Stevens failed to fund the escrow. *See* Exs. 39, 102, 143.

   e. During the summer of 2002, Stevens was preoccupied by the sale of his business to a company called Fairfield. According to Stevens, it was a "tough" time that consumed substantially all of his energies. Ex. 29.

   f. In July of 2002, Stevens signed a Reaffirmation Agreement that confirmed his guarantee obligations to Accelerated. Ex. 101. He reaffirmed his guarantees notwithstanding previous concerns about Accelerated's and Finova's servicing of the Consumer Notes. *See* Ex. 44.

   g. On September 12, 2002, Accelerated demanded that MLVO and Stevens satisfy their obligations with respect to the replacement or repurchase transaction that had not been completed in June of 2002. This demand letter was not placed in evidence by the parties, but is referred to in other documents. *See* Exs. 129, 140.

   h. On September 26, 2002, Stevens responded by complaining about the adequacy of notice Accelerated had provided. He complained that the written notice had not been signed, even though the Purchase Agreements do not say the notice must be signed. He also stated that he wanted to "revisit" all of MLVO's past replacements of non-performing Consumer Notes. Ex. 129.

   i. On September 30, 2002, Stevens stated in a letter to Accelerated that he would prepare a schedule of delinquent notes that would constitute the "approved accounting" unless Accelerated notified him otherwise. Exs. 127, 128.

   j. On October 4, 2002, Accelerated's attorney asserted that Stevens and MLVO were not in compliance with their repurchase and replacement obligations, that Accelerated would not revisit previous replacements, and that email notices and the email transmission of delinquency reports had been treated as sufficient written notice of delinquencies in the parties' prior dealings. Ex. 126. Accelerated reiterated this fact in later correspondence. Ex. 143.

- 9 -

    k. Brenda LeClair, an employee of MLVO, subsequently confirmed that the parties' previous replacement transactions had been instituted by telephone and email communications. Ex. 141.

    l. On the basis of these communications and other evidence described below, the Court finds not only that the Purchase Agreements failed to specify a particular form of written notice, but also that the parties had engaged in a course of dealing through previous replacement transactions in which email and phone conversations were treated as sufficient notice under the Purchase Agreements.

    m. The parties continued to disagree about the required form of notice through early December of 2002 and also continued exchanging information about the replacement transaction that had not been completed in June of 2002. On December 11, 2002, Brenda LeClair stated unequivocally in an email to Accelerated that Stevens would pay the $71,000 due for the incomplete June 2002 transaction before the end of December, 2002. Ex. 136.

    n. Contrary to this communication, Ms. LeClair wrote to Accelerated's attorney 12 days later and asserted that there were "required changes to the notice" procedures. Ex. 30. Ms. LeClair stated that Accelerated must place original documents in escrow and place escrow instructions in the written notice to MLVO, and included other specific requirements for the notice. *Id.* Ms. LeClair stated that upon receipt of this correct notification as well as escrow information, MLVO would wire funds to Accelerated. *Id.*

    o. On January 8, 2003, Accelerated's attorney responded to Ms. LeClair and rejected the new notice requirements. Ex. 102. The letter noted that email communications had been used by the parties in the past and concluded that MLVO and Stevens were acting in bad faith in failing to provide the funds required by the never-completed June transaction.

    p. On June 16, 2003, counsel for Accelerated again noted that the transmission of emails and aging reports to MLVO had been treated by the parties in the past as sufficient notice under the Purchase Agreements, and that four replacements of Consumer

- 10 -

1  Notes had been completed on the basis of such practices. Ex. 39.

2      p.   As part of this communication, Accelerated substantially increased its
3  demand to approximately $775,000. A significant portion of this demand (the parties did not
4  present evidence as to how much) consisted of late fees due under the Purchase Agreements.
5  This demand triggered a series of sharp exchanges between the parties, some of which
6  continued to concern the notice requirements. Exs. 22, 23, 40, 42, 85, 105.

7      r.   The sharp communications continued through early April, 2003. On
8  May 5, 2003, MLVO and Stevens filed this lawsuit against Accelerated.

9   5.  Stephanie Hardy, the portfolio manager for Accelerated, testified concerning
10 communication practices between the parties. Although Plaintiffs pointed out errors in
11 calculations performed by Ms. Hardy, the Court found her testimony about practices between
12 the parties to be credible. Ms. Hardy testified that Accelerated sent MLVO aging reports that
13 showed the status of every Consumer Note, including those that were more than 60 days past
14 due and therefore delinquent under the Purchase Agreements. Ms. Hardy testified that these
15 reports were emailed every Monday to MLVO. She also testified that these emails included
16 the following notice:

17  > Please be advised that this email is written notice of the requirement to replace the delinquent accounts within 30 days. If these loans are not repurchased or rehabilitated by [30 days from today's date], the $20 per day late fees will begin to accrue for each loan on the 31st day. Furthermore, in the event that any or all of these delinquent notes were stated in an earlier notice and/or demand, the earlier date applies.
18
19
20

21 Ex. 25. Ms. Hardy further testified that the aging reports contained all of the information
22 necessary for MLVO to calculate its obligation under the replacement and repurchase terms
23 of the Purchase Agreements: the outstanding principle balance of the delinquent Note, the
24 Note's accrued interest, and the days delinquent (which would permit calculation of late fees).
25 Ms. Hardy further noted that each Consumer Note could be identified from the aging report
26 as belonging to a particular transaction, and that the Purchase Agreement for that transaction
27 specified the discount rate applicable to the Note. With this information, Ms. Hardy testified,
28 MLVO could calculate its repurchase and repayment obligations under the Purchase

- 11 -

Agreements.

      6.     On the basis of the foregoing facts, all of the other evidence at trial, and the credibility of the witnesses, the Court makes the following specific findings with respect to the notice issue:

         a.     The parties engaged in a course of conduct that used email as "written notice" under the Purchase Agreements prior to June of 2002.

         b.     The parties completed several replacement transactions on the basis of such notices.

         c.     The Purchase Agreements did not specify the kind of written notice required, and the email notice utilized by the parties was sufficient under the terms of the Agreements.

         d.     Plaintiffs failed to close a substantially completed replacement transaction in June of 2002.

         e.     When Accelerated demanded in September of 2002 that the transaction be completed, Plaintiffs began demanding a more detailed form of notice than had previously been required by the parties' course of dealing.

         f.     During the course of these demands, Plaintiffs promised that Stevens would pay the amount due from the incomplete transaction before the end of December, 2002. This payment was not made; Plaintiffs instead demanded "changes" to the notice requirements.

         g.     These actions by Plaintiffs resulted in a dispute between the parties in early 2003 that culminated in the filing of this lawsuit. Although it appears that inaccurate information was transmitted by Accelerated during the course of this dispute, the Court finds that the parties' previous course of dealing provided Plaintiffs with sufficient notice to trigger their obligations under the Purchase Agreements. The Court also finds that Ms. Hardy continued to transmit aging reports and email notices to Accelerated throughout the course of the parties' dispute and that such transmittals constituted sufficient notice under the Purchase Agreements.

- 12 -

7.	On the basis of the foregoing findings, the Court finds that Accelerated did not breach the written notice provisions of the Purchase Agreements.

**E.	Accelerated Did Not Breach the Covenant of Good Faith and Fair Dealing by the Manner in Which it Provided Notice to Plaintiffs.**

1.	As noted above, the Court finds that Accelerated's notices to Plaintiffs satisfied the written notice provisions of the Purchase Agreements. The Court further finds that the email notices provided by Accelerated were consistent with the parties' course of dealings before June of 2002.

2.	The Court finds that Accelerated did not breach the covenant of good faith and fair dealing when it provided notices by email, nor did it breach the covenant when it continued to utilize such notices after June of 2002.

3.	Although the parties ultimately disputed the extent of Plaintiffs' obligations under the Purchase Agreements, and Plaintiffs introduced evidence to suggest that some of Accelerated's demands during this dispute were inaccurate, the Court concludes that Accelerated did not breach the covenant of good faith and fair dealing in providing notice to MLVO and Stevens. The dispute between the parties arose primarily because of Plaintiffs' failure to close the repurchase transaction in June of 2002 and their continuing refusal to do so throughout the second half of 2002. Accelerated did not act in bad faith by refusing to accede to Plaintiffs' demands for a changed form of notice.

4.	Stephanie Hardy testified credibly that she provided aging reports and email notices to Plaintiffs throughout the parties' dispute in 2003, and the Court finds these notices sufficient under the Purchase Agreement.

5.	The Court accordingly finds that Accelerated did not breach the covenant of good faith and fair dealing implied in the Purchase Agreements through the form of notices provided to Plaintiffs.

**F.	Causation.**

1.	The parties disagree on the cause of the high delinquency rates in the Consumer Notes purchased by Accelerated.

2.	The Court concludes that the high delinquency rates were caused by a number of factors.

  a.	The primary cause of the higher than expected delinquency rates was the fact that the parties were not engaged in a coordinated and concerted effort to manage the portfolio and prevent delinquencies. The Court finds that the primary cause of the parties' inability to engage in coordinated activities was Plaintiffs' failure to close the replacement transaction in June of 2002 and their continuing refusal to do so, along with new demands for notice and other complaints, through the end of 2002.

  b.	The delinquency problems were caused in part by servicing problems encountered during the time some of the notes were with Concord. Ex. 146.

  c.	The delinquency rates were caused in part by servicing problems encountered when the notes were being serviced by Finova.

  d.	A major cause of the delinquency rate was the inefficient and problematic transfer of accounts between Concord and Finova, problems that arose in large measure from Concord's handling of the transition. Exs. 142, 143, 144.

  e.	Once serious disputes commenced in the first half of 2003 and litigation commenced in May, coordinated and careful attention to the Consumer Notes did not occur.

  f.	These causes of the high delinquency rate do not excuse Plaintiffs' performance under the Purchase Agreements. As noted above, the Court finds that Accelerated did not act in bad faith and did not breach either its servicing or notice obligations under the Purchase Agreements. Nor does the Court find that Accelerated's actions prevented MLVO and Stevens from performing their obligations.

**G.	Stevens Did Not Tender Performance.**

1.	Plaintiffs contend that Stevens tendered performance of his repurchase and replacement obligations by twice offering to buy all of the Consumer Notes in Accelerated's possession. The repurchase and replacement provisions of the Purchase Agreements, however, applied only to delinquent Notes. Accelerated had an interest in retaining non-delinquent Notes. Those notes would earn for Accelerated the profits bargained for in the

- 14 -

Purchase Agreements. Stevens' offer to repurchase all of the Consumer Notes, including those that were not delinquent, was not consistent with the terms of the Purchase Agreements, would have deprived Accelerated of anticipated and bargained-for future profits on performing Notes, and therefore did not constitute tender of Stevens' obligation under the Purchase Agreements.

**H.    Accelerated Did Not Fail To Mitigate Its Damages.**

1. Plaintiffs contend that Accelerated failed to mitigate its damages by refusing Stevens' offer to repurchase all of the Notes. As noted above, however, such a repurchase was not called for in the Purchase Agreements and would have deprived Accelerated of the profits it expected to earn from performing Consumer Notes.

2. Accelerated took other steps to mitigate its damages. It offered to waive penalties early in the parties' dispute if Plaintiffs would fulfill their replacement and repurchase obligations, and it retained EMCC to engage in collection efforts when the delinquent Consumer Notes were not replaced or repurchased by Plaintiffs.

**I.    Damages.**

1. The Court finds that Accelerated is entitled to recover $775,039.09 in discounted principle of the delinquent Consumer Notes and $303,504.93 in accrued interest on those Notes, from Plaintiffs, as set forth in Accelerated's Exhibit 153. This constitutes the current discounted principle amount of the delinquent Consumer Notes and accrued interest to which Accelerated is entitled under Paragraph 7 of the Purchase Agreements. Ex. 4, 6, 8, 10, 12.

2. The Court finds and concludes, for the reasons stated in its previous Order, that Accelerated is not entitled to recover penalties as provided for in the Purchase Agreements. *See* Doc. #95 at 11-12.

**CONCLUSIONS OF LAW**

A.    MLVO breached the Purchase Agreements and Stevens breached the Individual Guarantees and the Reaffirmation Agreement by failing to replace or repurchase delinquent Consumer Notes as set forth above.

1        B.    Accelerated did not breach the Purchase Agreements.

2        C.    Plaintiffs are not released from liability under the Purchase Agreements, the Individual Guarantees, or the Reaffirmation Agreement.

4        D.    There was no effective tender by Plaintiffs.

5        E.    Accelerated did not fail to mitigate its damages.

6        F.    The amount owed to Accelerated is determined by multiplying the outstanding principle amount of delinquent Consumer Notes by the discount rate applicable to those Notes and adding the accrued interest on those Notes.

9        G.    Plaintiffs argue that Stevens is entitled to suretyship status under the Restatement (Third) of Suretyship and Guarantee. Relying on Section 37 of the Restatement, Plaintiffs argue that Stevens should be discharged from his guarantee obligation because Accelerated acted to increase the potential cost of his performance. Plaintiffs have not satisfied the requirements of Section 37.

Section 37(1) provides that "[i]f the obligee [Accelerated] acts to increase the secondary obligor's [Stevens'] risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obligor [Stevens] is discharged as described in subsections (2) and (3)[.]" Under this provision, a discharge occurs only "as described" in subsections (2) and (3) of Section 37.

Subsection (2) provides that a secondary obligor is discharged only if the obligee (Accelerated) releases the principal obligor (MLVO) from a duty or agrees to a modification of the duties of the principal obligor (MLVO) that either amounts to a substituted contract or imposes a risk on the secondary obligor (Stevens) fundamentally different than those imposed prior to the modification. *See* § 37(2)(a)&(b). Plaintiff presented no evidence that Accelerated released MLVO from a duty or modified the duties of MLVO in a way that amounted to a substituted contract or imposed new risks on Stevens.

Subsection (3) identifies six specific circumstances in which the principal obligor's duty will be discharged, none of which applies to the facts established at trial. The only

arguably applicable provision is found in subsection (3)(f), but even this subsection requires the obligee (Accelerated) to impair the principal obligor's (MLVO's) duty of performance or duty to reimburse, or impair the secondary obligor's (Stevens') right of restitution or subrogation. Plaintiffs presented no evidence that Accelerated impaired MLVO's duty of performance or duty to reimburse, or that Accelerated impaired Stevens' right of restitution or subrogation against MLVO.

Because the specific criteria set forth in Section 37 of the Restatement have not been satisfied, the Court concludes that Stevens is not discharged from his guarantee obligation by virtue of that provision.

## SUMMARY

Accelerated is entitled to judgment in the amount of $1,078,544.02. Plaintiffs are not discharged from their obligations under the Purchase Agreements, Individual Guarantees, and Reaffirmation Agreement. Accelerated shall submit a proposed form of judgment. The parties shall brief any attorneys' fees issues in accordance with LRCiv 54.2, except that the Memorandum in Support shall be filed within 14 days of the entry of judgment, not 60 days as specified in LRCiv 54.2(b)(2). The response and reply shall be filed as provided in LRCiv 54.2(b)(3).

DATED this 7th day of March, 2006.

David G. Campbell
United States District Judge